**Kevin LEWIS, a/k/a Kevin Tyrone Lewis, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 06–02–00106–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Dec. 18, 2003.

Decided Jan. 7, 2004.

Noemi A. Collie, Dallas, for appellant.

Frank Long, Franklin/Hopkins County Dist. Atty., Martin E. Braddy, Asst. Dist. Atty., Sulphur Springs, for state.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

Kevin Lewis, a/k/a Kevin Tyrone Lewis (Kevin) was one of three individuals who attacked Jack Torres–Diaz (Jack), a mentally retarded twenty-four-year-old male functioning at the level of a five- or six-year-old child. Kevin appeals from his conviction—and his resulting sentence of ten years' confinement—for intentionally and knowingly causing bodily injury to a disabled individual.

Jack typically spent his days pushing his customized wheelbarrow around Cooper, Texas, collecting used aluminum cans for recycling. To Jack, his pride-and-joy wheelbarrow was a Peterbilt truck, "Lucky." After all, Lucky sported two chrome smoke stacks, a CB radio, license plate, stickers, light, and a mud flap. While pushing Lucky in a city park on April 19, 2001, Jack was attacked and injured by three individuals who, before fleeing the scene, also damaged Lucky. Jack testified that, as he exited the park's bathroom, he was grabbed by the waist, thrown to his back, and kicked repeatedly. Recognizing Kevin as one of his attackers, Jack later provided both a description and Kevin's name to police.

Kevin contends on appeal the evidence was factually insufficient to support his conviction, the trial court erred by excluding certain evidence regarding Jack's character, and Kevin was entitled to a new trial based on newly discovered evidence. We affirm.

**Sufficiency of Evidence**

In his first point of error, Kevin contends the evidence was factually insufficient to support, beyond a reasonable doubt, Jack's identification of his assailant. Kevin essentially argues that, because of Jack's mental disability and testimonial inconsistencies, his identification of Kevin was inherently unreliable and his adverse testimony was against the great weight and preponderance of the evidence. Kevin maintains, in fact, that Jack's testimony is "of such an unreliable nature that it is impossible to even determine without reasonable doubt that there was actually an

assault," let alone that Kevin was involved. We disagree.

Building on the foundation laid in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996), the Texas Court of Criminal Appeals stated in *Jones v. State*, 944 S.W.2d 642, 647–50 (Tex.Crim.App.1996), that the process of reviewing a claim of factual insufficiency begins with the assumption the evidence is legally sufficient. Courts of appeals must then consider all of the evidence in the record related to an appellant's challenge, not just the evidence supporting the verdict. *Id.* In doing so, "[t]he appellate court reviews the evidence weighed by the jury which tends to prove the existence of the elemental fact in dispute, and compares it to the evidence which tends to disprove that fact." *Jones*, 944 S.W.2d at 647. The reviewing court may disagree with the jury's determination; "[h]owever, a factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder," avoiding substantial intrusion "upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Id.* at 648 (citing *Clewis*, 922 S.W.2d at 133). Appellate courts, therefore, will only disturb a jury's verdict when it is so against the great weight and preponderance of the evidence as to be manifestly unjust, shocking to the conscience, or clearly demonstrative of bias. *Id.*

A determination of factual insufficiency may be reached in either of two ways: (1) when considered alone, evidence supporting the existence of a vital fact is factually too weak to support it; or (2) when balancing evidence supporting both positive and negative inferences, it is clear the jury's finding is against the great weight and preponderance of the evidence. *Goodman v. State*, 66 S.W.3d 283, 285–86 (Tex.Crim. App.2001). In other words,

the complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.

*Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim.App.2000).

■ Addressing separately the two methods of determining whether evidence supporting the jury's verdict was factually insufficient, we first direct our attention to Kevin's claim that the State's evidence was too weak to establish the identity element of the charged offense. As Jack was the only eyewitness, the State necessarily relied on his statements and testimony that Kevin was his principal assailant. It is well established that a conviction may be based on the testimony of a single eyewitness, *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex.Crim.App.1971); *Pitte v. State*, 102 S.W.3d 786, 794 (Tex.App.-Texarkana 2003, no pet.); however, Kevin contends no jury could have reasonably relied on Jack's factually inconsistent account of the attack or identification of his attacker.

Without directly raising the issue of Jack's competency at trial or on appeal, Kevin makes repeated references to Jack's mental retardation, suggesting that this, when viewed in conjunction with all of the evidence, diminishes his credibility to the point that it is simply too weak to support his identification of Kevin as his attacker. Kevin argues that even the testimony of those witnesses asked to offer an opinion about Jack's truthfulness qualified their appraisals of him as a truthful person by saying he also has a tendency to exaggerate and fantasize. Kevin's position is that

this tendency to fantasize is only emphasized by Jack's own testimony that his so-called truck "is as real as she can be."

■■■ Taking Jack's mental retardation into account, however, the trial court required him to be qualified before he was permitted to testify for the State. It is well within the discretion of the trial court to determine a witness' competency, and the court's ruling on the matter will not be disturbed absent an abuse of discretion. *Avila v. State*, No. 74,142, 2003 WL 21513440, at *8, 2003 Tex.Crim.App. LEXIS 142, at *26 (Tex.Crim.App. July 2, 2003).

> [T]here are three elements which must be considered in determining whether a witness is in fact competent to testify. The first is a capacity to observe intelligently at the time of the events in question. The other elements of capacity are recollection and narration, though the former is usually merged into the latter. The capacity to narrate involves on the one hand, both an ability to understand the questions asked and to frame intelligent answers and, on the other hand, a moral responsibility to tell the truth. If a person afflicted with a physical or mental disability possesses sufficient intelligence to receive correct impressions of events he sees, retains clear recollection of them and is able to communicate them through some means there is no reason for rejecting his testimony.

*Watson v. State*, 596 S.W.2d 867, 870–71 (Tex.Crim.App.1980) (citations omitted). Responding to the trial court's questioning, Jack provided his full name, testified he knew the difference between lying and telling the truth, answered correctly all of the court's hypothetical questions, and said he knew he had given an oath to tell the truth and someone who fails to tell the truth can get in serious trouble. The court, finding no reason to reject his testimony, allowed the trial to proceed.

Kevin focuses the greater part of his argument on Jack's inconsistent statements throughout the process of identifying his attacker-including discrepancies in Jack's initial complaint, statements to his guardians and friends, and identification of Kevin in a photographic lineup and at trial. He notes, for example, that in Jack's initial complaint two days after the assault, he provided police with the name "Kevin Lewis" and described Kevin as having dreadlocks and green eyes; at trial, Jack testified that Kevin was known to him only as "K.T.," that he was unable to describe dreadlocks, and that Kevin's eyes were brown. Kevin also points to the fact that, although earlier testimony by law enforcement personnel indicated Jack both identified Kevin in a photographic lineup and signed his initials next to Kevin's photograph, Jack agreed that he identified Kevin in the photographic lineup, but denied having signed his initials, claiming that someone else must have done so.

■■■ Regardless of any inconsistent statements as to the details of the offense, such discrepancies reflect on a witness' credibility, a matter singularly within the purview of the fact-finder. The jury heard evidence as to Jack's mental retardation, the process by which he identified Kevin, and evidence suggesting numerous flaws and inconsistencies with Jack's identification of Kevin. The jury, having had the opportunity to observe firsthand Jack's demeanor, as well as his ability to respond to questioning and to recall information about his assault, ultimately chose to accept his testimony over the evidence presented by the defense. "The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony" and are entitled, therefore, to believe or disbelieve all or any part of a

witness' testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App.1981). After carefully reviewing all of the evidence both for and against the finding, we cannot say the State's evidence identifying Kevin as Jack's assailant is so weak as to undermine our confidence in the jury's determination of guilt. *See Johnson*, 23 S.W.3d at 11.

The next question we must consider is whether the evidence supporting the conviction is greatly outweighed by contrary proof. *Id.* Comparing the facts in this case to the facts in *Johnson*, Kevin contends the accuracy of Jack's identification was questionable because of the existence of adverse conditions. The *Johnson* court reasoned that, because the victim in that case only managed a brief and obstructed nighttime view of her attacker's face while bright headlights were shining in her eyes, the accuracy of her "in-court identification could not shoulder sufficient reliability to establish beyond a reasonable doubt that appellant carried out the assault." *Id.* at 12. The current case contrasts with *Johnson* in that Jack was attacked in the middle of the day, did not have an obstructed view, and recognized his attacker as someone with whom he was already acquainted.

The adverse conditions to which Kevin apparently refers are those previously addressed; namely, what Kevin describes as Jack's propensity to fantasize and make up stories, embellish, and even lie, in addition to the fact that he functions at the level of a five- or six-year-old child. The comparison between *Johnson* and the present situation, however, is unwarranted because the factors Kevin urges this Court to consider are questions of competency and credibility rather than indicators of factual insufficiency—questions appropriately resolved by the trial court and the jury, respectively.

In addition to detailing the discrepancies in Jack's testimony and questioning the accuracy of the identification of his attacker, Kevin also directs our attention to facts suggesting that an assault may not even have occurred. He urges, as an alternative theory, that Jack may have been involved in some sort of accident in which he damaged his wheelbarrow and sustained bodily injuries. After all, the police officer, noting the abrasions, bruising, scratches, and swelling on Jack's back and rib cage indicated the possibility that such injuries could have been caused from being rubbed against a rock. Kevin also introduced evidence the chrome smoke stacks might not have been broken by attackers as Jack claimed but, instead, at least one of the stacks may have been intentionally removed with a hacksaw. Such evidence, although supportive of Kevin's alternative theory, is not itself conclusive and certainly does not rise to the level of greatly outweighing or overshadowing the evidence presented by the State.

**Character Evidence**

In his second point of error, Kevin argues the trial court erred in refusing to admit character evidence concerning Jack's ability to distinguish between reality and fantasy. Without citing the case in response to any of the State's trial objections, Kevin now relies exclusively on *Schutz v. State*, 957 S.W.2d 52 (Tex.Crim. App.1997), in support of his position that he should have been allowed to introduce both general and specific character evidence through the State's expert. In *Schutz*, the Texas Court of Criminal Appeals recognized that society may view certain witnesses, including children and mentally retarded persons, as "impaired," viewing with suspicion the competency of a class of people to testify because of a condition or disability embodied by that class. *Id.* at 70. The court went on to state that

[w]hen an "impaired" witness or declarant is expected to testify, expert testimony should be permitted in the offering party's case-in-chief concerning the ability of the class of persons suffering the "impairment" to distinguish reality from fantasy and to perceive, remember, and relate the kinds of events at issue in the case.

*Id.* For this reason, Kevin claims the trial court erred when it sustained the State's objection to his attempt to elicit character evidence from the State's expert.

The record clearly indicates, however, that although Kevin did attempt to ask some questions regarding the general characteristics of mentally retarded people, which he was entitled to do in this situation, his questions were designed to delve into characteristics specific to Jack. In a hearing outside the presence of the jury, Kevin's trial attorney stated: "Your Honor, what I think that we're getting into are not only general characteristics of individuals that have been diagnosed similar to Mr. Diaz, but also specific characteristics of this individual about his trustworthiness, his ability to decipher between fantasy and reality, truthfulness, [and] untruthfulness." The difficulty with maintaining this position is that *Schutz* itself limits evidence admitted under the impaired witness theory "to a discussion of the class rather than the individual witness and should focus on the ability of the class to accurately perceive, remember" and relate the kinds of events at issue in the case, "rather than any tendency to do so." *Id.*

The specific information Kevin attempted to introduce into evidence was contained in the report on which the State's expert based his opinion. The report, however, was approximately nine years old, and the expert used only the part of the report dealing with intelligence testing to determine whether Jack was mentally retarded—not the part Kevin was interested in exploring. The trial court found that the expert had no personal knowledge of the making of the report and that the information contained in the remaining portion of the report appeared to be, not a review of Jack himself, but a review of what other people had concluded about him. In other words, the court found that the report, outside of the intelligence testing used to determine whether Jack was mentally disabled, was based on the single, double, or even triple recall of people who observed him nine years earlier. Even so, the court permitted Kevin to ask about the functional age level corresponding to Jack's intelligence testing scores and, even though the expert stated he had no opinion as to Jack's ability to distinguish between reality and fantasy, Kevin managed to get him to admit that, according to the report, there had apparently been issues in this area in the past.

 The real question here is whether the trial court committed reversible error when it refused to allow Kevin to question the State's expert regarding the general ability of mentally retarded persons to distinguish reality from fantasy. We will review a trial court's decision to exclude evidence under an abuse of discretion standard, *Salazar v. State,* 38 S.W.3d 141, 153–54 (Tex.Crim.App.2001); however, to preserve such a complaint for appellate review, the complaining party "must bring forward a record indicating the nature of the evidence" and, "[i]f the excluded evidence is not apparent from the context of the record, it must be brought forward either through a timely offer of proof or a formal bill of exception," *Haygood v. State,* No. 04–02–00685–CR, 127 S.W.3d 805, 812, 2003 WL 22656878, at *5, 2003 Tex.App. LEXIS 9562, at *14 (Tex. App.-San Antonio Nov. 12, 2003, no pet. h.)

(citing Tex.R.App. P. 33.1, 33.2; Tex.R. Evid. 103(a)(2)).

■ "When ... there is no bill of exception or offer of proof to show the facts the defendant could have proved through cross-examination of an adverse witness, the issue has not been preserved for appellate review." *Jenkins v. State,* 948 S.W.2d 769, 775 (Tex.App.-San Antonio 1997, pet. ref'd) (citing *Love v. State,* 861 S.W.2d 899, 901 (Tex.Crim.App.1993)). In this case, although Kevin's trial attorney stated she wanted to get the expert's opinion as to the general ability of mentally retarded persons to distinguish between reality and fantasy, the record is devoid of any showing of what the expert's testimony would have been. The evidence contained in the excluded portion of the report on which the State's expert relied provided an assessment, not of the general ability of mentally retarded persons to distinguish between reality and fantasy, but of the specific findings of Jack's 1992 evaluation. Absent an offer of a statement concerning what the excluded evidence would show as to the ability of mentally retarded persons in general, nothing is presented for our review. *Guidry v. State,* 9 S.W.3d 133, 153 (Tex.Crim.App.1999).

**Newly Discovered Evidence**

■ In his third point of error, Kevin contends the trial court erroneously denied his motion for new trial based on newly discovered evidence. Not only does the decision to grant or deny such a motion fall within the sound discretion of the trial court, subject to reversal only on a finding of an abuse of that discretion, *Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App. 1995), but these motions are generally disfavored by the courts and viewed with great caution, *Drew v. State,* 743 S.W.2d 207, 225 (Tex.Crim.App.1987). A trial court does not abuse its discretion in deny-

ing a motion for new trial unless the record demonstrates that (1) the newly discovered evidence was unknown at the time of trial; (2) the failure to discover the new evidence was not due to a lack of diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *Wallace v. State,* 106 S.W.3d 103, 107–08 (Tex.Crim.App.2003) (citing Tex. Code Crim. Proc. Ann. art. 40.001 (Vernon Supp.2004)).

The newly discovered evidence presented in Kevin's motion for new trial is embodied in the affidavits of two individuals approached by Jack after he was attacked, but before he went to the police to make his initial complaint. The significance of the affiants' statements apparently lies in their claim that Jack told them he had been attacked, but failed to name his attacker, and that he believed the three men were from Commerce, Texas, and had been driving a red Camaro. Contrary to Kevin's contention, however, the affidavits contain nothing more than cumulative evidence designed to impeach Jack by suggesting further confusion and inconsistency in his recollection of the April 19 attack—a point clearly demonstrated at trial. The affidavits simply offer no new information, making it highly unlikely the admission of this evidence would have led the jury to reach a different result.

**Conclusion**

Having determined that the State's evidence identifying Kevin as Jack's principal assailant is factually sufficient, that Kevin waived any error as to the admissibility of general character evidence relating to an "impaired" witness' class, and that the trial court did not abuse its discretion in deny-

ing Kevin's motion for new trial, we affirm the judgment of the trial court.